Next case of the morning, Solomon Colors, Inc. v. State of Illinois Department of Revenue, 410-0814. For the appellant, Mr. Bowery, thank you. And for the athlete, Mr. Keaton. Mr. Bowery, you may proceed. Good morning. May it please the Court. My name is Sunil Bowery, and I'm Illinois Assistant Attorney General here on behalf of the defendants, appellants, Illinois Department of Revenue, its director, and the Illinois State Treasurer. This is an appeal of a bench trial verdict finding that the purchases of what are known as totes, essentially containers used to ship colorant from Solomon Colors plant in Springfield, Illinois, to its customers throughout the State of Illinois, the purchases of those totes are not subject to the Illinois Use Tax Act. The issue is fairly straightforward. The question is whether the purchases of the totes by Solomon were made with the intent to resell the totes, and therefore not subject to use tax, or whether the purchases of the totes were made with the intent to use or consume the totes within the State of Illinois, and thus subject to use tax. Pursuant to a stipulation entered into between the Department of Revenue and representatives of Solomon Colors, the parties agreed to use certain evidence related to the question of the usage of the totes that pertained to a prior audit, the 2000-2002 audit. Now the audit that we're concerned with here today is an audit related to tax years 2003. Well what precisely was the stipulation? The stipulation was that the Department of Revenue would not recreate the wheel as to the usage of the totes. What is the purpose of the totes? It is true that the primary document that we rely on was used in the 2000-2002 audit to determine whether the totes were subject to use tax. In that audit, the 2000-2002 audit, the totes were subject to the use tax? Right, yeah, we concluded that the totes were subject to the use tax. And so your argument is they agreed then that the totes for the next audit would be also subject to the use tax? That was the stipulation, that's what I'm trying to get out of you. Right, the stipulation was to the documents itself. They objected to our assessment of use tax for the 2000-2002 audit. Now this exactly isn't in the record, but I know that they paid that use tax because the tax may have been subject to the Amnesty Act penalties, and to avoid the potential penalties or interest on that use tax. That use tax had been paid. They didn't really stipulate to the fact that the totes were subject to use tax. They stipulated that these documents would be used by the department to determine whether the totes were subject to use tax. Now we have the exact same documents from the 2002 audit that we're using in the 2003-2006 audit. And it's a pretty blatant admission in Defendant's Exhibit No. 10 where Solomon Cullors admits that they plan to use and reuse the totes 20 times. And I think that makes that pretty clear that the purpose of purchasing the totes was not to transfer ownership to any particular customer. They plan to use and reuse the totes 20 times. What about the evidence showing that that in fact wasn't the case? I don't think that the evidence really contradicted this document. Well, the document was just part of the evidence supporting your position, wasn't there? Also testimony that, yeah, we just sold them. And it was theirs to use or keep or do what they wished. Sometimes they gave it back to us, or they didn't. Right. Well, that is what the evidence of the Solomon Cullors witness... Well, given that that's the evidence before the trial court, how can we agree with you that the trial court's ultimate decision was unreasonable? Right. Not wrong, but unreasonable. Isn't that really the standard? Right. It is. And I understand that the standard of review is a hurdle that we have to overcome. It certainly is. But if you look at the evidence as a whole, and that's what the court has to do. I know that the appellate court doesn't re-weigh the evidence, but it has to weigh the evidence in favor of Solomon Cullors against the entire record. And what Mr. Kreutzer testified to was, we ship the colorant inside of these totes to our customers, and when it's cost feasible, we take them back. Sometimes we discard them and leave them there. And if you look at the department's regulation, 86 Illinois Administrative Code Section 130.2070, the regulation states that purchases of tangible property for the purpose of, excuse me, it says, for the purpose to provide a means of containing tangible personal property within the property at issue, which is the totes, if the purpose is to deliver to the customers while retaining and reusing the containers, or discarding the containers at the location of the customers, that type of property is for the purpose of use or consumption. And that's what Mr. Kreutzer testified to. Sometimes we take the totes back and we use and reuse them, which is what document number 10 attests to, or sometimes we discard the totes at the location. But if I buy some of this color and I decide to keep the tote, are they going to call me up and ask me about it? Well, no. I think we have to take that back in the light most favorable to the winner below, which is Solomon. And there's testimony that some of the clients keep them and use them for storing other liquids or colorants. Right. I will say on that one point, one thing we would like to stress is that testimony also does contradict Solomon's own documentary evidence. And this is not a typical he said, she said type of case where the trial court has to weigh which side to believe. Isn't the documentary evidence ambiguous? I don't think the documentary… In referring to years earlier in any event? But there was a stipulation that we would still use this document to determine the usage of the totes during the 2003 to 2006. What does that mean? Well, that means that Solomon agreed that this document, Exhibit Number 10… Was it visible? What does it say about whether it was still in force and that's what was still going on? Don't you have to actually put forth some evidence? I think the document speaks for itself. And what Solomon College is trying to do is present a witness that contradicts its own evidence. Now certainly this document wasn't prepared in anticipation for litigation. There's no evidence of that. But now we have a witness who's trying to contradict… So what year is it referred to? This document? Yes. Well, it doesn't specifically refer to any particular year. The document itself doesn't. The document itself simply states that the cost of a tote is $643 and Solomon plans to use and reuse each tote about 20 times. And it calculates what's known as a tote recycle fee that it charges each particular customer. Now that tote recycle fee is based on Solomon's intention to use and reuse the totes 20 times. So it's charging a fee that's calculated based on its intention to use and reuse the totes 20 times. I think that shows that at the time Solomon purchases these totes, it doesn't intend to sell the totes to any particular customer. There's no evidence that a sale has been made. There's nothing on the invoice that shows that a particular tote is sold for a particular price. Likewise, when a customer returns a tote, there's no evidence that Solomon… So what did the trial court say with regard to your argument pertaining to the exhibit? You know, the trial court didn't say much. The trial court said it would take it for what it's worth. There was no evidence contradicting the fact that there was an agreement between the department and Solomon Colors that the exhibit would serve as evidence for determining what the usage of the totes were. Now plaintiff's counsel objected to this document on the basis that it applied to a prior audit period. But our witness, Douglas Moore, the auditor, he testified that there was this agreement that we would use this document to determine usage of the totes. And Solomon did not put on any evidence to contradict that agreement. So that agreement went unrebutted. Let's go back to what Justice Steigman said. Right. Isn't the stipulation… doesn't it have the effect of saying this is admissible and it's relevant? Correct. It's not determinative. I mean, there's nothing in the stipulation that says it's determinative of today. It's rather, this is a way to facilitate us going forward without you doing another audit. I completely agree with that. Well then, what's so strange about one piece of evidence contradicting another piece of evidence? Because this isn't your typical, he said, she said, where… I understand that, but where does… why does a document from 2002, which is relevant and admissible because it's a past practice, how does that automatically carry greater weight than present day practice or live testimony regarding this is what we do and this is what we expect? Right. Well, maybe I wouldn't say that it necessarily carries greater weight, even though there's a blatant admission on the part of Solomon that they use or reuse the totes, but Solomon's own testimony is not really inconsistent with its blatant admission. The people from Solomon that testified, were they asked about the exhibits? I don't believe they were asked about the exhibits. Why not? You know, the exhibit came into evidence with our witness. I don't know why our trial counsel didn't ask that. Well, if, indeed, does your case consist of anything at all other than the exhibit? Yeah, it does. Well, not much, counsel, if there is anything else. Well, I would say it consists of the administrative regulation, too, which fits perfectly with what Solomon Culler's testimony. Well, it seems to me that if you're claiming this document trumps the testimony at a minimum, when we're talking about the trier of facts evaluation of all this evidence, you need to confront the people who are testifying and say, isn't your testimony inconsistent with your own business record pertaining to the practices of what your company does with the totes? Right. We didn't do that. Well, then, I'm the trier of fact. I'm drawing inferences from the behavior of the parties in front of my, in my courtroom. I'm thinking maybe there's a reason they didn't cross-examine the people from Solomon Culler's on this exhibit, and the reason is they don't want to hear the answer. I can't really speak to that. That may be the case. Well, it's kind of like the missing witness instruction, isn't it, where if there is some witness who could have been called and some line that could have been pursued and wasn't, the reasonable trier of fact could draw a negative inference from the failure to do so? Like, well, like what? Why shouldn't I draw a negative inference from your failure, that is, the Attorney General's failure, to cross-examine the witnesses with this document to see what explanation, if any, can be forthcoming? You know, it may have been that the witness at Solomon had a trial. We did not subpoena any witnesses from Solomon to trial. It doesn't matter. But there they are saying something allegedly inconsistent with what you're telling us this document stands for, and you're sitting there holding the document and saying, no questions. Right. And I go back to saying that I don't think it's necessarily inconsistent with what the document says. The document says we plan to use and read. Well, the testimony is we don't. These folks are just part of the whole thing. And now you say the document says, no, that's not true. Well, the testimony actually is sometimes we do take the totes back and we do reuse them. But we're not selling them. We're selling the totes like a can of paint. Here's the paint and here's the can that goes with it. And we don't expect it back and we're not requiring it back. Sometimes when they call us up and say, hey, will you get rid of these things, we'll take them. Right. Isn't that the testimony? Right, that is the testimony. Okay, and you have this document, and you say, well, wait a second, Mr. Solomon Painsky. What about this document from your own company? Except that line of questioning never occurred. It didn't occur, no. I'm the trier of fact. Why shouldn't I think, well, this must not be too terrific a document if they're not going to use it to confront and cross-examine the key witnesses who are explaining testimony or providing testimony inconsistent with it? Well, I think that it should have particular relevance to the case because it is a blatant admission. And Solomon's testimony attempted to contradict a documentary piece of evidence that had an admission in it. I guess that's the best response I can give. I still don't believe that the testimony was necessarily inconsistent. I'm the trier of fact. Why can't I believe the testimony from these people, especially since it stands uncontradicted except for the document that wasn't used to cross-examine it? What's unreasonable about my believing those witnesses? Well, the unreasonableness, I would say, would be that this document was not prepared in anticipation of litigation. So? It has more credibility. It's admissible, but what's its significance for purposes of years later? Are the practices set forth in the documents still taking place? I don't think there's any evidence to rebut that. That's because you didn't ask. After all, he's saying, no, we're not selling these things. We're just part of the whole process. Right, but the trial court's decision has to be weighed against what's in the record. Well, what's in the record is what happened in 2002, isn't it? That's the only thing the document definitively says. What does it say about two years later? It doesn't say anything about two years later. I know. It says nothing about two years later. Oh, 2000 to 2002. Solomon agreed that this document pertains to our usage of the totes for the 2003 to 2006 audit. It's like a request for the genuineness of a document. We're not going to challenge it on foundational grounds. Its pertinence has to still be demonstrated, doesn't it? Right, and I guess I'll keep coming back to the fact that Solomon's witness' testimony is ideally consistent. Let me ask you a question about if it's mine and somebody keeps it and doesn't send it back, why am I not calling them up? And then later when they call me up and say, you know, we really don't want to keep this, and you say, well, you're going to have to pay, you know, as a convenience, we'll pick it up, but you're going to have to pay a recycling fee. That doesn't sound like it belongs to me anymore. It sounds like I freely gave it up, and if it comes back to me and I can reuse it, that's a benefit to my company. That's a benefit to our business. But I have no particular expectation it will come back because it's a useful container. Right. And or some people may object to paying a recycling fee, and maybe some people that are close to my distribution point, if they call and say pick these up, I'll pick them up for free because, yeah, I can reuse them. Right. But that doesn't sound like a possessory interest in them. It sounds like customer accommodation. Right, and that presents perfectly the dichotomy between possessory interest and ownership interest. If Salomon ships the totes to its customers and discards the totes and says, you know, we're not going to pick it up, maybe for good reason because it's not cost beneficial for them to do so in some locations, that doesn't necessarily transfer ownership of the totes, although possession of the totes has been transferred. Well, if I stop by that yard, that manufacturing facility, and they're sitting out in front and I pick them up, that's not a theft, is it? I mean, if they're discarded, nobody owns them at that point. Nobody owns them, right. Nobody owns them. So Salomon has left it to the choice of the customer what they want to do with it. That's not purchasing totes for the purpose of selling it to Salomon. And remember, use tax does not apply here if Salomon purchases the totes with the intention of resaling the totes to its customers. Salomon doesn't charge the customers anything for shipping the totes. There's just insufficient evidence to show that there was an actual resale of the totes in mind when Salomon purchased the totes from the out-of-state purchaser, Granger Plastics. If there are no other questions, Your Honor, we do respectfully request that the judgment of the circuit court be reversed. We'll hear from you, Honorable Bob. Mr. Keeton. Thank you, Your Honor. May it please the Court, Mr. Bawe, Obviously we've heard enough about totes and everybody knows what totes are. They're big containers. So I'm not going to go through any of that. But I would indicate to the Court that the key in this case, as I think the Court has honed in on, is not whether it is possible that some of these totes may be returned at a different time and refurbished and reused by Salomon Colors in the course of their business. The key is not whether at some earlier time, some earlier audit period, there had been this document which was essentially some kind of costing document to say how much does a tote cost if we were able to reuse it. The key, nor is the key, as I think Mr. Bawe was just saying, it sounded to me as if he was saying is the only way that you could not find this to be a purchase for resale is if Salomon Colors didn't fill up the tote and sold the tote to somebody else, which is not what the law involves. What we have here, as the trial court appropriately noted at the beginning, is the issue of did the tote transfer in ownership in conjunction with the sale of the product that it held? And the trial court found that that's exactly what happened. Just like when you buy, as Justice Knecht said, a gallon of paint or toner in a cartridge for a copy machine, the sale of the container went with the sale of the product. And as a result of that sale of the product in the container, the purchase from Grainger Plastics back during the period of the audit would have been a purchase for resale, not a purchase for use or consumption in the state of Illinois. And I think you've already seized on the issue. It really boils down to a pretty simple question. If after selling the tote full of this liquid colorant and the use of that colorant by the customer of Salomon, could Salomon Colors have gone out to its customer and said, give us our tote back? And I think the evidence is pretty clear that it could not. There's nothing to support the proposition that Salomon Colors could go back to its customers and say, hey, you've got our tote, give it back to us. Did anything in Exhibit 9 or 10 suggest what you just indicated? No, I don't believe so, Your Honor. I don't believe it suggests that. As the Court has explored with Mr. Bawe, that is a document prepared apparently for some costing analysis. So there's nothing in there that says your client could have gone to the recipient of the tote and said, we want it back? I do not believe it says anything of that nature, Your Honor. And the entire evidence in the series of bits and pieces of that evidence that show the handling and the disposition of the totes supports that as well. When Salomon Colors bought the totes, it didn't place them in inventory as a capital asset. It didn't capitalize them, depreciate them, track them, mark them as being owned by Salomon Colors. When it sold the tote full of color, it had a sticker on the outside that said, this has so many pounds or gallons and here's the tare weight and here's the empty weight. It didn't ask for a security deposit of any kind on the tote. The customers could do what they wanted with the tote. And as Mr. Kreutzer testified, they did various things with them. Some of them they redeployed to some other use and put chemicals in them. Some of them ended up in landfills. Some of them ended up in Australia, never to be seen again. And some of them, if the customer requested that Salomon Colors come pick them up, ended back up with Salomon Colors. What if the evidence showed that the majority of the totes that had ever been dispersed with colorant in it returned and were reused by you? I'm sorry, you said, if they... If the evidence showed that. I don't think that's significant because the question still becomes, when you bought the tote of colorant, did you buy the whole thing? Did ownership transfer to you not only for the liquid inside the tote but the tote itself? And whether 90% came back or 10% came back doesn't change that issue in terms of whether the ownership transferred. And in terms of the return of the tote, those that were returned, as I indicated, Salomon Colors couldn't compel the concrete user who had bought the product to call them and say, come get your tote. Couldn't send out a truck and say, hey, we're here to pick up our totes. What seems to occur in the return totes is that, as Mr. Kreutzer testified, the disposition of the tote may create issues for the purchaser in whether or not to landfill it and whether it has to be dried out and what condition it has to be in. So it becomes kind of a two-sided economic decision between the customer who's bought the tote full of color product and Salomon Colors as to whether or not they get together and say, hey, we've got an empty tote over here. Do you want to come pick it up? And Salomon Colors, on the other hand, says, from a matter of goodwill, yes, we'll do that. We'll bring it back. There's no guarantee to Salomon Colors when it gets that tote back that it's going to be worth anything. It's taking its economic risk in making the decision to send the truck out, to pick it up, bring it back. If it's able to be cleaned, if it's able to be refurbished, if it still passes inspection and can be reused, then it makes sense for Salomon Colors to reuse it. But that does not interfere at all with that initial question of who owns that tote when it's sold. And if the ownership, as we believe, transferred to the purchaser, and as the court found, transferred to the purchaser, then that's the end of the question. The... Counsel, before you move on to your next topic, this is somewhat of a digression, I suppose, but the department argues that no certificate of resale was tendered. Who, if anyone, should have prepared the certificate of resale? Well, if the certificate of resale is to protect the retail seller in Illinois under the retail occupation tax, the retailer's occupation tax, and so it is designed to protect the seller when the Department of Revenue comes knocking and says, why didn't you collect sales tax on that transaction that you made in selling these products or this tote to Salomon Colors? It doesn't affect Salomon Colors in that situation because it's the responsibility of the retailer to collect that tax. And so the certificate, if this had been an Illinois sale, you would have expected, if the seller was not going to collect the tax to be remitted to the State of Illinois, that the seller would be there with the certificate and says, here, you've got to sell this, otherwise I've got to collect sales tax from you. In this situation, we don't even have an Illinois seller. We've got an Ohio seller. And there's, you know, I don't know what the Ohio sales tax law would require, whether or not the Ohio seller should have asked Salomon Colors for some version of a certificate of resale that would have applied to its sales tax. But the onus, from my perspective, rests upon the seller of the product. The grain there... Who would the seller be here? I think in my brief I suggested if you had Springfield Plastics that was making the totes, that Springfield Plastics would have been the party responsible for obtaining the certificate of resale. Okay. Thanks for the clarification. Sure. Once you get to the conclusion that the ownership transferred, as I've indicated in the brief, the Department of Revenue regulations indicate that that would make this a sale for resale. I'm not going to quote it, but it's in pages 5 and 6 of our brief, 86 Illinois Administrative Code, Section 130.2070. And once you determine that if this sale had occurred in Illinois, that it would not be subject to sales tax, then the use tax says if this sale had occurred in Illinois and would not have been subject to sales tax, then the use tax doesn't apply. That's the provisions in 35 ILCS 105-365. It simply says if the seller of tangible personal property for use would not be taxable under the retailer's occupation tax, despite all elements of the sale occurring in Illinois, then the use tax does not apply to the use of the tangible personal property in this state. And that's what we have. We have a sale outside the state of Illinois, which if it had occurred in the state of Illinois, would not have resulted in the seller of the totes collecting sales tax. Therefore, you don't have use tax that applies. Any other questions? Thank you. Mr. Bonnelly. Thank you. May it please the Court. Notwithstanding the fact that Solomon Clarke's witness testified that the customers of the paint have the option of returning the totes if they have no use of them, I still fall back on the Administrative Regulation 130.2070C1, that's 86 Illinois Administrative Code, that says that if the seller of the container, or sorry, the purchaser of the container, and here's kind of weird because we have two sales, we have a purchaser, Solomon, and then there's a sales. Solomon's the purchaser of the container, but if the purchaser of the container intends to either retain and reuse the containers or discard the containers at the ultimate location, those sales from Granger to Solomon would still be subject to the Illinois Use Tax Act. Unless the Court has any other questions. What happens to my TOR cartridges when I send them back to HP or Dell? I mean, they sell me the ink, but it's in a container, but they make it very convenient for me to send it back to them in a mail order. And I understand this. I mean, I'm genuinely asking this question. I mean, it seems to be somewhat analogous. They say it's going to be recycled. Well, I don't know what that means. The plastic is going to be crushed and reused, or does it mean that those cartridges, whether small or large, are reused by that original seller? What were they selling me? Were they selling me the ink and the cartridge? Because I've got to have the right cartridge or it isn't going to fit my printer. But they make it very easy for me to send it back to them. And if I'm green, I do. If I'm environmentally friendly. But if I don't, they don't call me up and say, you know, where are our cartridges? Do you have an idea of what might happen with those? You know, I don't know specifically in the context of these cartridges, but I think the answer would lie in what is the seller of the inks' intention at the time that company purchases the cartridges from the manufacturer? Well, are they making it easy for me to send them back because that's an economic benefit and they actually expect and hope that to be the case? Or is it simply a customer accommodation and they don't really care, but if they get them back, that's okay. Maybe they can find a use for them. Well, I would say that if their intention at the time they purchase the cartridges from the manufacturer is that they would get them back and that they could use and reuse them. What if it's their hopes that they will get them back rather than their intention? Is that the same? Their hope at the time they purchase the cartridge from the manufacturer, if that's their hope, then that's what they purchased the cartridge for the purpose of, using and reusing the cartridges. If that's what their purpose was, then it is subject to use. How about the paint store? A local paint store sells it to a contractor and the contractor says, you know, I don't want to keep all these paint cans around. Will you take them back? And they say, well, we'll take them back if you want to bring them to us. But they're selling the paint and the can and whether they bring them back or not is entirely up to the purchaser of the paint. Right. If the seller of the paint intended at the time he purchased the cans from the manufacturer that, look, we want these cans back. Well, they've just sold it. If the purchaser of the paint from the paint store wishes to bring them back because they're just going to add clutter. In fact, the paint store has the ability to clean them out and use them again. If the guy who purchased the paint, the contractor, wants to bring them back, they'll do it, but they aren't requiring it. What's that? If the intention was that they hoped for... I told you what their intention was. They just sold it. Right. And if the contractor who uses the paint on housing development wants to bring them back, they'll take them, but they haven't required it. They haven't mentioned it. There it is. Right. Well, in that case, use tax wouldn't apply. And I would still take objection to the testimony. How is that different from the case before us here? One, I would object to the statement that there's nothing in the record to show that Solomon couldn't go back and take the totes from an unwilling customer. There's nothing to say that they couldn't do that. If they could do that... Well, is there any evidence to support it that that's what they do? Didn't the one witness who testified say, no, we don't do that? He said, we don't do that. He didn't say that we couldn't do that. And for business reasons, they may not want you to keep good business relationships with their customers. Well, then they don't intend to do it. And that should be the end of the case, shouldn't it? Well, they do intend to use the totes. Their desire is to use and reuse the totes. Counsel, we do understand that you weren't trial counsel. Right. That had trial counsel asked some of the very questions that we're asking, that the record would be... might very well be different. Now, you can't do anything about that now, but I want you to know that. We recognize that you're arguing with the record that you have. Thank you. Take the matter under your fire.